**SO ORDERED.**

**SIGNED this 15th day of May, 2014.**



_____
Robert E. Nugent
United States Chief Bankruptcy Judge

_____

DESIGNATED FOR ONLINE PUBLICATION ONLY

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

IN RE:
                      )
CLIFTON JAY SMITH,        )    Case No. 12-12240
KATHRYN MARIE SMITH,  )    Chapter 13
                      )
         Debtors.    )
_____)

### ORDER SUSTAINING DEBTORS' OBJECTION TO
### NATIONSTAR MORTGAGE'S PROOF OF CLAIM
### AND FOR FURTHER PROCEEDINGS

Nationstar Mortgage told Clifton and Kathryn Smith that if they made three trial payments in November and December of 2011 and January of 2012, Nationstar would modify their home mortgage loan. As the lender requested, the Smiths executed a payment forbearance agreement with Nationstar and timely made the trial payments. Nationstar sent them a Loan Modification Agreement that they signed and

-1-

returned. Then, even though the Smiths had fully complied with Nationstar's conditions and timely returned the signed modification agreement, Nationstar refused to execute it and instead wrote the Smiths two months later to tell them that their loan "did not meet investor guidelines."[1]

When a mortgage creditor offers a conditional home loan modification with definite terms to borrowers and the borrowers not only satisfy those conditions, but also accept the loan modification offer, the offer and its acceptance form an enforceable contract. The mortgage creditor cannot thereafter revoke its offer or "reject" the borrowers' acceptance. If the mortgage creditor's offer is not conditioned upon its compliance with undisclosed duties to unidentified third parties, its duties to those third parties cannot excuse its performance of the obligations it undertook to perform, once its offer has been accepted (unless those obligations are somehow unlawful). Here, the Smiths did everything they were supposed to, but Nationstar refused to execute the modification agreement it had offered them because it concluded that its investor, Federal National Mortgage Association (FNMA), would not permit the modification because it had recourse to its assignor and could require the assignor to repay the defaulted obligation.

As Nationstar was bound by the terms of its modification offer, its claim in this case must be allowed under the terms of the loan as modified. Nationstar's calculations are instead based on the terms of the original mortgage note. The debtors' objection to

---

[1] And that's *all* they told them. *See* Ex. E.

Nationstar's proof of claim should be SUSTAINED.[2]

### *Jurisdiction*

Objections to claims and confirmation of chapter 13 plans are core proceedings over which the bankruptcy court has subject matter jurisdiction.[3]

### *Facts*[4]

On May 19, 1999, Clifton and Kathryn Smith executed a promissory note to FT Mortgage Companies, promising to repay $65,951 over thirty years at 7.25% per annum in equal monthly installments of principal and interest in the amount of $449.91. They also granted FT a mortgage encumbering their home in Conway Springs, Kansas, to secure repayment of the note. The note is endorsed in blank, "without recourse."[5]

No later than November of 2009, the Smiths defaulted on their mortgage

---

[2] Dkt. 28. Following an evidentiary hearing held on April 15, 2014, the Court took this matter under advisement. Debtors appeared in person and by their attorney Martin J. Peck. Nationstar Mortgage appeared by its counsel Carrie Mermis. Karin Amyx appeared on behalf of the chapter 13 trustee Laurie B. Williams.

[3] 28 U.S.C. § 157(b)(1) and (b)(2)(B) and (L); 28 U.S.C. § 1334.

[4] The parties stipulated to the admission of all exhibits. Even though Exhibits 1 and 2 contain unexecuted copies of the Payment Forbearance Agreement and Loan Modification Agreement (and related documents), counsel advised the Court that there was no dispute that the debtors properly executed all of the necessary agreements and timely returned them to Nationstar in accordance with the directions provided by Nationstar (and Nationstar's witness so testified).

[5] *See* Ex. A.

Case 12-12240   Doc# 75   Filed 05/15/14   Page 3 of 15

payments.[6] At that time, the remaining principal balance due was $53,948.[7] The parties offered no evidence about what occurred in the ensuing two years, but did agree that, in October of 2011, the Smiths applied to Nationstar Mortgage, by now the servicer of the loan for First Horizon Home Loans, a division of First Tennessee Bank National Association, for a loan modification. On October 24, 2011, Rob Bush, a "foreclosure prevention specialist" at Nationstar e-mailed the Smiths and told them –

> You have been approved for a modification that starts in February. Before the modification is official, there are 3 months of trial payments that need to be made. The funds need to be in by the 1st of the month so the payments need to be made before the 31st of each month so the funds will be in house on the 1st. For example: the first trial payment is due November 1st, so the payment needs to be made on or before the 31st of October by certified funds, either by Western Union, Moneygram or money order. If you have any questions please call me directly.[8]

Attached to the e-mail were two documents, a cover letter and a forbearance agreement. The cover letter sets out the due dates and amounts of the requisite three trial modification payments (in lieu of debtors' normal mortgage payment) and states unequivocally that "[a]fter all trial period payments are timely made, *your mortgage will be permanently modified . . . .*"[9] The Payment Forbearance Agreement that was attached to this e-mail also states at paragraph 3.C. that during the "deferral period" (while the trial payments are being made), the lender will review the loan and

---

[6] *See* Ex. D, p. 10.

[7] *Id.*

[8] *See* Ex. 1.

[9] *Id.*

-4-

determine whether "additional default resolution assistance" will be offered, including as a possibility that "Lender will offer to modify my Loan."[10] The Forbearance Agreement also provides that, during the trial period, Nationstar agreed to forbear further enforcement proceedings in connection with the Smiths' loan.

To be sure, the Forbearance Agreement left Nationstar several "outs." Paragraph 3.C. contemplates the possibility that the lender might, upon review, decline to modify the loan, offer some other form of assistance, or simply proceed to foreclose. Paragraph 3.D. states "I understand that the [Forbearance] Agreement is not a forgiveness of payment on my Loan or a modification of the Loan Documents" and it further states that the lender is not "obligated or bound" to modify the loan.[11] Nothing in the Payment Forbearance Agreement or the correspondence mentioned above refers to a need to meet "investor guidelines" as a condition precedent to modification.[12]

After they executed and returned the Forbearance Agreement, the Smiths made the three trial payments on time and, on January 18, 2012, Rob Bush sent them a Loan Modification Agreement, an Agreement to Maintain Escrow Account, and a Letter of

---

[10] *Id.*

[11] *Id.*

[12] Paragraph 3.C. of the Forbearance Agreement described five possible alternatives of default resolution assistance that Nationstar could offer. *See* Ex. 1, p. 5. The Court acknowledges that the fourth alternative – to offer some form of payment assistance or alternative to foreclosure on the lender's terms in ¶ 3.C.(4)– was subject to the further approval of the investors or insurers on the loan, but concludes, in the absence of any contrary contention by Nationstar, that it offered the third alternative – to modify the Smiths' loan – under ¶ 3.C.(3).

-5-

Acknowledgment, all attached to an e-mail.[13] The subject line of the e-mail read "Please send docs back signed notarized [sic] by 1/24/12 - thank you." The Loan Modification Agreement dated January 18, 2012 provided for the repayment of the outstanding balance of $69,319.84 at a reduced interest rate of 3.75% per annum, amortized from February 1, 2012, and payable in 360 equal monthly principal and interest installments of $321.02 commencing on March 1. The Smiths signed the Loan Modification Agreement before a notary public and returned it to Nationstar, along with the other two documents.

Then, on March 19, 2012, Nationstar wrote them stating that they did not meet the loss mitigation guidelines because "Investor Guidelines Not Met."[14] There was no further explanation. The Smiths did everything they were supposed to, but Nationstar refused to execute the modification agreement it had offered them because it concluded that its investor, Federal National Mortgage Association (FNMA), would not permit the modification. At trial, Nationstar's witness, Mr. Hyne, testified that the Smiths' loan was ineligible for loss mitigation because First Horizon had assigned it to FNMA "with recourse," meaning that FNMA could require First Horizon to repay FNMA's investment.[15] Because of that, Mr. Hyne said, the Smiths' loan file was "processed in error" and the loan file subsequently flagged for "no mitigation." Neither side offered

---

[13] *See* Ex. 2.

[14] Ex. E.

[15] The Court cannot square this testimony with the non-recourse endorsement stamped on the face of the original note.

evidence about the extent of FNMA's investment or the details of the "recourse" agreement.

Mr. Hyne also testified that after Nationstar "withdrew" its offer to modify, it pursued attempting another form of modification through the Federal Housing Administration that would have allowed Nationstar to file a claim with the Government for payment of the Smith's arrearage. Unfortunately, by the time Nationstar concluded that the Smiths were ineligible for the original modification, they were also ineligible for the FHA relief because that only covers a 12-month deficiency and the Smiths were then behind by more than a year. According to Hyne, the Smiths had no available relief.

But in April of 2012, the Smiths reapplied for modification and, notwithstanding their file having been flagged by the servicer, received another three-month trial period on April 30, 2012.[16] They executed and returned another forbearance agreement on May 16, 2012, but did not successfully complete the three-month trial.[17]

The Smiths filed this chapter 13 case on August 15, 2012, disclosing on their Statement of Financial Affairs that First Horizons had commenced a foreclosure action in 2012, obtained a judgment, and scheduled a sheriff's sale. In the chapter 13 plan

---

[16] Ex. C. The April 30, 2012 cover letter signed by Foreclosure Prevention Specialist Kim Graham contained identical language to the first trial period cover letter sent to the Smiths: "After all trial period payments are timely made, your mortgage will be permanently modified."

[17] Likewise, the new Payment Forbearance Agreement contained virtually identical terms as the 2011 Forbearance Agreement. Ex. C, ¶s 3.C. and 3.D.

they filed with the petition, the Smiths proposed to pay $1,056 per month over 36 months.[18] In paragraph 9 of the plan, they provided for payment of the First Horizon mortgage debt through the trustee in the amount of $69,654.57 with an arrearage of $3,888. Nationstar objected to confirmation contending that debtors understated the arrearage and filed a proof of claim in the amount of $73,212.17, including an arrearage of $23,993.14 on the date of the petition.[19] The debtors objected to Nationstar's proof of claim.[20]

For their objection to Nationstar's claim, the Smiths allege that they should only be liable for payments in arrears that came due after they made their last trial payment in January of 2012 and executed the Loan Modification Agreement.[21] Had Nationstar honored its offer to modify their loan, that agreement would've taken effect on February 1, 2012 and their arrearage would only include missed payments from and after March 1 – some 6 months. Their prior arrearage was added back into the principal amount of the modified obligation and reamortized. Nationstar argues that its rejected modification is a dead letter that doesn't affect the Smiths' long-term arrearage. The Chapter 13 Trustee advised that the present plan cannot be confirmed

---

[18] Dkt. 8.

[19] Proof of Claim 4-1.

[20] Dkt. 28.

[21] In their objection, the debtors also initially challenged Nationstar's standing as the real party in interest to enforce the mortgage loan but advised at trial that Nationstar's standing was no longer an issue in the case. The Court deems this issue abandoned or waived. Dkt. 28.

-8-

because the plan payment debtors propose does not cure this large arrearage, rendering the plan unfeasible. She takes no position on the debtors' objection to Nationstar's claim.

### Analysis

To prevail on their objection to Nationstar's claim, the debtors had the burden of meeting the presumption of its validity that the Bankruptcy Code and Rules provide.[22] They met the presumption by presenting evidence that they made the requisite three trial payments in November and December, 2011 and January 2012, that Nationstar offered to them a loan modification, and that they accepted the offer by returning the signed Loan Modification Agreement before Nationstar "withdrew" the offer.[23] The burden of persuasion then shifted to Nationstar to prove its claim by a preponderance of the evidence. Whether the parties' correspondence, the executed forbearance agreement, and the debtors' execution of the proffered Loan Modification Agreement separately or together amount to an enforceable contract is a matter of state law as is the determination of the extent to which Nationstar's claim should be allowed.[24]

The Forbearance Agreement states that it is governed by Texas law even though

---

[22] *See* 11 U.S.C. § 502(a) and Fed. R. Bankr. P. 3001(f).

[23] At the hearing, counsel stipulated that the debtors executed the Loan Modification Agreement and that Nationstar received it.

[24] *See* 11 U.S.C. § 502(b)(1) (Claim allowed except to extent unenforceable under applicable law).

it affects a note that is secured by Kansas real property.[25] The Loan Modification Agreement, Agreement to Maintain Escrow Account, and Letter of Acknowledgment were all accepted and executed by the debtors in Kansas. None of them contains a choice of law provision. In general, federal courts apply the choice of law principles employed by the courts of the forum state.[26] Kansas courts generally apply the law the parties have chosen unless honoring that choice would offend public policy.[27] While Texas law specifically applies to interpreting the Forbearance Agreement, its legal effect is not in dispute here. The Loan Modification Agreement involves the same note secured by the same Kansas property and does not contain a choice of law clause.[28]

---

[25] Ex. 1, ¶ 3.J.

[26] *Dang v. UNUM Life Ins. Co. of America*, 175 F.3d 1186, 1190 (10th Cir. 1999); *In re Patterson*, 375 B.R. 652 (Bankr. D. Kan. 2007) (While dischargeability of debt is a bankruptcy issue, whether debt was owed was a state law issue requiring Kansas bankruptcy court to apply Kansas choice of law principles.).

[27] *See Davis v. Miller*, 269 Kan. 732, 739, 7 P.3d 1223 (2000) (parties' choice of law provision incorporating Kansas Uniform Premarital Agreement Act in postmarital settlement agreement was not contrary to public policy and therefore enforceable). *See also* Restatement (Second) of Conflict of Laws, § 187 (1969) (Law of the state chosen by the parties to govern their contractual rights is an exception to general conflict of law principle that law of the state where land is located applies); *Mark Twain Kansas City Bank v. Cates,* 248 Kan. 700, 705-07, 810 P.2d 1154 (1991) (applying Missouri choice of law provision to a mortgage covering Kansas property and executed in Missouri); *In re Hildyard,* 2014 WL 222113 at *4-5 (Bankr. D. Kan. Jan. 17, 2014) (applying Kansas choice of law provision in loan agreements and notes executed in Kansas to Colorado property encumbered by deed of trust).

[28] Except as modified by the Loan Modification Agreement, the terms of the original note and mortgage remain in full force and effect. Ex. 2, p. 4, ¶ 5.(b). The underlying Note contains no choice of law provision and is prepared on a FHA Kansas fixed rate note form. Ex. A. The mortgage is a FHA Kansas Mortgage form and provides that it is governed by the law of the state where the property is located

-10-

In the absence of a choice of law provision in the Loan Modification Agreement, Kansas choice of law principles must be applied to determine which substantive state law should apply.[29] The Kansas courts have not adopted the Restatement (Second) of Conflict of Laws which utilizes the "significant relationship" test.[30] Instead, they follow the first Restatement's *lex loci contractus* rule – the law of the state where the contract is made.[31] Under either Restatement's rule and on these facts, I conclude that Kansas law governs the Loan Modification Agreement in question. Kansas is the place of contracting.[32] The first Restatement provides that the state from which the acceptance

---

- Kansas. Ex. B, ¶ 14.

[29] *Clements v. Emery Worldwide Airlines, Inc.,* 44 F. Supp. 2d 1141, 1146 (D. Kan. 1999) (Case brought in Kansas was governed by Kansas choice of laws).

[30] *Id.*; *Layne Christensen Co. v. Zurich Canada,* 30 Kan. App. 2d 128, 38 P.3d 757 (2002) (Kansas appellate courts follow the Restatement (First) of Conflict of Laws when addressing choice of law issues); *Central Power Systems & Services, Inc. v. Universal Underwriters Ins. Co.,* __ Kan. App. 2d __, 319 P.3d 562 (2014) (In deciding which state's law to apply to a contract dispute, Kansas courts apply the Restatement (First) of Conflict of Laws). *See also* Restatement (Second) of Conflict of Laws, § 188 (1971).

[31] Restatement (First) of Conflict of Laws, § 332 (1934) (law governing validity of contract); *Wilkinson v. Shoney's, Inc.,* 269 Kan. 194, 210, 4 P.3d 1149 (2000) (citing Restatement (First) of Contracts, § 74 (1932) – a contract is made when the last act necessary for its formation occurs and at the place where that final act is done); *Central Power Systems & Services, Inc., supra* (applying law of place of contract formation and for choice of law purposes that is the place in which the last act required for formation occurs); *Foundation Property Investments, LLC v. CTP, LLC,* 37 Kan. App. 2d 890, 894-95, 159 P.3d 1042 (2007) (Kansas applies the *lex loci contractus* doctrine for contractual disputes, which include promissory notes and mortgages).

[32] Restatement (First) of Conflict of Laws, § 311 (place of contracting) and § 326 (1934) (place of contracting when acceptance sent from one state to another).

is sent is the locus of the contract.[33] The Smiths accepted the loan modification offer when they signed and returned the agreement – the last act necessary to the making of a binding contract – in Kansas.[34] Thus the doctrine of *lex loci contractus* doctrine indicates that Kansas law governs here. Kansas also has the most significant relationship to the transaction and parties.[35] The Smiths and their property subject to the mortgage are located in Kansas and the Smiths executed the agreement in Kansas. The ultimate issue here is whether the debtors' signing the Loan Modification Agreement operated as an acceptance of an offer that formed a binding contract and Kansas law applies in making that determination.

Kansas courts follow the rule stated in the Restatement (Second) of Contracts that an offer, once accepted, cannot be revoked by the offeror.[36] An offeree's exercise of

---

[33] Restatement (First) of Conflict of Laws, § 326(b) (1934) (place of contracting when acceptance sent from one state to another).

[34] *See Clements,* 44 F. Supp. 2d at 1146 (applying *lex loci contractus* to choice of law issue and applying substantive law of Kansas since that was the place of contract formation.); *Layne Christensen Co.,* 30 Kan. App. 2d at 144 (contract is made where the last act necessary for its formation occurs); *Wilkinson,* 269 Kan. at 210.

[35] *See* Restatement (Second) of Conflict of Laws, § 188 (1971).

[36] Restatement (Second) of Contract § 36(1) provides that an offeree's power of acceptance may be terminated *inter alia* by revocation by the offeror. The power of acceptance is terminated when the offeree receives the offeror's manifestation of an intention not to enter into the proposed contract. Restatement (Second) of Contracts § 42 (1981). *See Berryman v. Kmoch,* 221 Kan. 304, 310, 559 P.2d 790 (1977) (an offer to sell may be revoked before the offeree exercises the power of creating a contract by acceptance of the offer); *Talbott v. Nibert,* 167 Kan. 138, 144, 147, 206 P.2d 131 (1949) (an option to purchase property becomes an enforceable contract after acceptance and before the offer is withdrawn); *Nieschburg v. Nothern,*

-12-

the power of acceptance creates a contract.[37] As the comment to Restatement (Second) of Contracts states, "[o]nce the offeree has exercised his power to create a contract by accepting the offer, a purported revocation is ineffective as such."[38] So, after the Smiths successfully made their three trial payments as the Forbearance Agreement required, Nationstar sent them a proposed Loan Modification Agreement with all pertinent terms defined. The agreement came under cover of an e-mail that required the document to be signed, notarized, and returned by January 24, 2012. The Smiths complied. Nevertheless, Nationstar argues that it withdrew its offer to modify the Smiths' mortgage loan. The Smiths executed and returned (*i.e.* accepted) the Loan Modification Agreement in a manner consistent with the instructions they were given by Nationstar's representative and prior to their receiving Nationstar's March 19

---

101 Kan. 110, 165 P. 857 (1917)(mortgagee's offer to assign a certificate of purchase issued under a foreclosure sale may be revoked until it is accepted; if the mortgagor accepts the offer and gives notice of acceptance with the time required, the accepted offer becomes a binding contract.).

[37] Restatement (Second) of Contracts § 35 (1981); *Nungesser v. Bryant*, 283 Kan. 550, 565-66, 153 P.3d 1277 (2007) (an unconditional and positive acceptance is required to form a contract); *Wachter Management Co. v. Dexter & Chaney, Inc.,* 282 Kan. 365, 370, 144 P.3d 747 (2006) (A UCC article 2 contract was formed when buyer accepted vendor's offer to sell it software by signing written proposal issued by vendor); *Steele v. Harrison,* 220 Kan. 422, 428, 552 P.2d 957 (1976) (A communicated offer creates a power to accept the offer that is made and only that offer.); *Wallerius v. Hare,* 200 Kan. 578, 582, 438 P.2d 65 (1968) (A contract is formed upon a positive and unequivocal acceptance of the offer.); *Prince Enterprises, Inc. v. Griffith Oil Co., Inc.,* 8 Kan. App. 2d 644, 649, 664 P.2d 877 (1983) (One method by which intention to contract may be demonstrated is by the process of offer and acceptance).

[38] Restatement (Second) of Contracts § 42, Comment c (1981).

rejection letter. Once they signed and returned the agreement, it was too late for Nationstar to withdraw or revoke its offer two months later.

Everything that passed between Nationstar and the Smiths before the March 19, 2012 rejection letter indicated that Nationstar intended to modify if the Smiths performed. Nothing suggested the existence of the hidden condition that the modification meet "investor guidelines." Remember that Nationstar had already assured the Smiths in the October 24, 2011 cover letter that "your mortgage will be permanently modified" if all trial period payments were timely made. After the Smiths made the payments, Nationstar offered them a detailed proposed modification agreement that they signed and returned. Then Nationstar attempted to terminate the Smiths' power to accept the offer by revoking it, claiming as an excuse its alleged obligations to a third party, FNMA. While a contracting party's failure to perform may be justified by impracticability or frustration of purpose, Nationstar did not assert either theory at trial and did not present any evidence to support that conclusion here.[39] All we know is that Nationstar belatedly concluded it could not modify this note and remain within FNMA's "investor guidelines." We do not know what those are because there is no evidence concerning the terms of Nationstar's contractual obligations, if any, to FNMA. As the party with the burden of persuasion, Nationstar had the burden to produce that information, but failed to do so.

Because the Smiths accepted Nationstar's offer to modify their loan before

---

[39] *See* Restatement (Second) Contracts, § 261 (Supervening impracticability discharges obligation) and § 265 (Supervening frustration discharges obligation).

-14-

Nationstar purported to revoke the offer, and because Nationstar has not substantially justified its refusal to honor the modification, Nationstar is bound by the provisions of the Loan Modification Agreement, at least for the purpose of allowing its claim here. The Smiths' objection to that claim is therefore SUSTAINED, but because the record is insufficient for me to determine the extent of their arrearage, if any, under the mortgage as now modified, the parties are granted 21 days in which to submit a stipulation as to the arrearage amount to be cured under the plan. If no stipulation is filed by June 6, 2014, the Clerk will set the matter for an evidentiary hearing. A hearing on Nationstar's objection to confirmation is continued until Nationstar's claim can be allowed.

# # #